Thomas W. Sowell and Lillian K. Sowell v. Commissioner.
Sowell v. Commissioner
Docket No. 80925.
United States Tax Court
T.C. Memo 1961-115; 1961 Tax Ct. Memo LEXIS 234; 20 T.C.M. (CCH) 562; T.C.M. (RIA) 61115; 16 Oil & Gas Rep. 227; April 25, 1961
*234 Leland E. Fiske, Esq., Adolphus Tower, Dallas, Tex., for the petitioners. Harold A. Chamberlain, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Deficiencies in income tax have been determined by respondent against the petitioners for the taxable years 1955, 1956, and 1957 in the respective amounts of $1,312.20, $1,032.54, and $1,378.74. The issues presented are the correctness of the respondent's action (1) in reducing the net income reported by petitioners from an oil and gas lease for 1955, 1956, and 1957 by $5,094.06, $7,170.29, and $3,600.15, respectively, and (2) in disallowing deductions of $9,883.41, $11,356.28, and $7,261.68 taken by petitioners as business bad debts for 1955, 1956, and 1957, respectively. Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioners, husband and wife, reside in Dallas, Texas, and filed their joint Federal income tax returns for 1955, 1956, and 1957 with the district director in that city. For those years the petitioners employed the cash basis of accounting and their income tax returns were prepared and filed on that basis. On February 21, 1942, the *235 petitioners and J. B. Sowell, sometimes hereinafter referred to as Sowell, owned all of the capital stock of Riverside Production Company, a Texas corporation. Riverside was liquidated on February 21, 1942, and on that date conveyed by deed to H. C. Moseley of Henderson County, Texas, sometimes hereinafter referred to as Moseley, a seven-eighths working interest in an oil and gas leasehold estate covering a portion of a 48.42-acre tract known as Section ISF-13241, patented on August 3, 1931, by the State of Texas to W. P. Luse, sometimes hereinafter referred to as the Luse lease. An oral agreement was made between Sowell, petitioners, and Moseley prior to the transfer by Riverside of the legal title to the Luse lease to Moseley whereby, in consideration of the experience and services of Moseley in the development and operation of the lease, Moseley would in fact own a one-fifth of the working interest of the lease and petitioners and Sowell would each own two-fifths of the working interest of the lease. Under the terms of the oral agreement Moseley was to operate the lease and remit two-fifths of the net income to petitioners and two-fifths of the net income to Sowell. From February 21, 1942, to *236 September 28, 1954, Moseley operated the Luse lease, sold the oil and gas obtained therefrom, received the proceeds of sale, and paid the operating expenses of the lease pursuant to the terms of the oral agreement referred to above. Each month Moseley furnished the petitioners with a monthly statement which set forth the gross income, expenses, and net income from the operation of the lease and showed the amount of income earned by the petitioners' two-fifths interest in the lease. Prior to September 28, 1954, it had been customary for Moseley to notify petitioners that their two-fifths of the net income from the Luse lease had been credited to his (Moseley's) bank account with the First National Bank of Athens, Texas. Also prior to September 28, 1954, the petitioners were authorized to and did, in fact, draw checks on Moseley's account with the bank for the amounts set forth in the monthly statements as their two-fifths of the net income from the lease. On August 16, 1954, Moseley borrowed $131,800 from the Citizens National Bank of Tyler, Texas, sometimes hereinafter referred to as Citizens National. This loan was secured by a deed of trust on the Luse lease and by an assignment *237 of the production income therefrom, which was executed by Moseley, as mortgagor, on August 16, 1954. On January 6, 1955, Moseley borrowed $36,000 from the First National Bank of Dallas, Texas, sometimes hereinafter referred to as First National, executing therefor a note in that amount dated January 6, 1955. As security for that loan Moseley executed a deed of trust pledging the Luse lease to the bank, subject to the previous deed of trust which he had executed as security for the loan of $131,800 obtained from Citizens National. On September 30, 1955, Moseley was in default in his payments on the $36,000 note which he had executed to First National. On that date First National purchased the balance ($87,481.62) of the note for $131,800 executed by Moseley to Citizens National and received from Citizens National a transfer and assignment of all of the latter's existing rights and interests in the Luse lease under the deed of trust and assignment executed by Moseley on August 16, 1954, as security for the loan of $131,800 made to him by Citizens National. The petitioners never at any time authorized Moseley to pledge the Luse lease as security for loans obtained by him. The loans *238 he obtained from Citizens National and First National were obtained without the knowledge or consent of petitioners and Sowell. No part of the proceeds from such loans were used at the direction or for the benefit of petitioners and Sowell. The petitioners never personally endorsed or guaranteed any note executed by Moseley. Following Moseley's execution on August 16, 1954, of the deed of trust to the Luse lease and assignment of the production income therefrom as security for the loan of $131,800 he had obtained from Citizens National, the production income from the Luse Lease, including the petitioners' two-fifths interest therein, was paid directly to Citizens National and applied by it as payment on Moseley's indebtedness owing to it until its sale of the note. Following First National's purchase on September 30, 1955, of the unpaid balance of the indebtedness owing by Moseley to Citizens National and throughout 1956 and 1957, the production income from the Luse lease, including the petitioners' two-fifths interest therein, was paid directly to First National and applied by it as payment on Moseley's indebtedness owing to it. Through out the years 1955, 1956, and 1957, no portion *239 of the income resulting from the operation of the Luse lease during those years was paid to the petitioners. Early in 1955 the petitioners discovered that Moseley had executed deeds of trust on and had assigned the production income from the Luse lease to secure his personal loans. Thereupon they made an investigation as to Moseley's solvency. As a result of their investigation they concluded that it would be useless to bring suit against him. At some undisclosed time in 1955 he became completely and hopelessly insolvent and has continued so. There is no basis for an expectation that petitioners will ever recover any amount from him on account of his wrongful use of their interest in the Luse lease and their share of the production income therefrom. On August 13, 1955, Moseley, on demand of petitioners and Sowell, executed an assignment of a two-fifths interest in the Luse lease to petitioner Lillian K. Sowell and on the same date executed an assignment of a two-fifths interest in the lease to Mary Rowland Sowell, wife of Sowell. On April 25, 1956, Moseley executed a promissory note in the amount of $35,000 payable to the petitioners and Sowell which was secured by an assignment *240 to petitioners and Sowell of Moseley's undivided five-eights interest in certain oil and gas leases on property situated in Caddo Parish, Louisiana, sometimes hereinafter referred to as the Louisiana leases. The foregoing assignment of the Louisiana leases was made subject to a first lien mortgage which Moseley had previously executed to First National. Thereafter First National foreclosed its mortgage on the leases and petitioners, in an attempt to salvage something from the leases by reworking them, bid them in for $5,000. The petitioners' attempts to rework the leases were unsuccessful and the leases were disposed of at a loss without the petitioners recovering any amount on Moseley's note or any funds to otherwise cover Moseley's wrongful use of petitioners' interest in the Luse lease. The net income from the petitioners' two-fifths interest in the Luse lease, being gross income less deductions for expenses, depreciation, and depletion, was as follows for the indicated years: Year
Net Income
1955
$8,254.88
1956
7,170.29
1957
4,029.92
The only income attributable to petitioners' interest in the Luse lease which was received in cash by petitioners during *241 1955, 1956, and 1957 was the following which was received in 1955: Item
Amount
Gross income
$7,641.65
Less: Expenses paid
1,497.84
Cash received
$6,143.81
The foregoing net amount of cash received, $6,143.81, represented cash payment to petitioners by Moseley of $2,275.97 as the balance due them for their share of the net income from the Luse lease for 1954 and $3,867.84 as part of the amount due them for their share of the net income from the lease for 1955. The above-mentioned $6,143.81 was paid by Moseley to the petitioners on the following dates in 1955 and in the amounts indicated: Date
Amount
January 28
$ 500.00
January 29
600.00
February 25
500.00
March 5
500.00
March 25
1,000.00
April 2
800.00
April 25
995.15
June 7
1,248.66
Total cash received
$6,143.81
Since June 7, 1955, Moseley has not made any further payments to the petitioners and the petitioners have received no payments from any other source on account of their share of the net income from the Luse lease having been applied in payment of Moseley's bank indebtedness. In Schedule C "Profit (or Loss) From Business or Profession" of their income tax returns *242 for 1955, 1956, and 1957, the petitioners stated that their principal business activity was "Crude Oil Production" and reported as having been received from the Luse lease net income in the amounts of $8,961.90, $7,170.29, and $3,600.15, respectively, computed as follows: Luse Lease
1955
1956
1957
Income
Gross sales or revenues
$15,987.77
$14,998.60
$13,479.99
Expenses
Operating expense
1,821.06
2,941.72
5,588.66
Production taxes
746.80
700.60
629.65
Depreciation
61.37
61.37
61.37
Total expenses
$ 2,629.23
$ 3,703.69
$ 6,279.68
Income before depletion
$13,358.54
$11,294.91
$ 7,200.31
Less: Allowable depletion (percentage)
4,396.64
4,124.62
3,600.16
Net income
$ 8,961.90
$ 7,170.29
$ 3,600.15
In determining the deficiency for 1955 the respondent determined that the net income of $8,961.90 reported by the petitioners as having been received in that year from their interest in the Luse lease operations was overstated by $5,094.06 and accordingly reduced the reported net income by that amount. The amount of the reduction was computed as follows: Amount
Reported
Correct
Amount of
In Return
Amount
Reduction
Income
Gross income
$15,987.77
$7,641.65
$8,346.12
Deductions
Expenses paid
1,821.06
1,147.70
673.36
Production tax
746.80
350.14
396.66
Depreciation
61.37
174.52
(113.15) [1]
Depletion (27 1/2% of gross income)
4,396.64
2,101.45
2,295.19
Total deductions
$ 7,025.87
$3,773.81
$3,250.06
Net income
$ 8,961.90
$3,867.84
$5,094.06
*243 With respect to the net income from the Luse lease reported by the petitioners in the amounts of $7,170.29 and $3,600.15 for 1956 and 1957, respectively, the respondent determined that the petitioners did not realize any income or sustain any deductible expenses in those years from the lease operations and accordingly reduced the net income reported by the petitioners for those years by the foregoing respective amounts. In reducing the reported net income of the petitioners for 1955, 1956, and 1957, as set forth above, the respondent has excluded from their income the amount which he determined was earned by the petitioners' two-fifths interest in the Luse lease during the respective years but which was not paid to petitioners in cash during such years. In their income tax returns for 1955, 1956, and 1957 the petitioners took deductions for business bad debts of $9,883.41, $11,356.28, and $7,261.68, respectively, as representing indebtedness owed to them by Moseley which became worthless in the respective years. In determining the deficiencies in controversy the respondent disallowed the deductions. Opinion The *244 petitioners, who employed the cash basis of accounting for Federal income tax purposes for the taxable years 1955, 1956, and 1957, reported in their returns for those years net income as follows from the Luse lease: 1955
$8,961.90
1956
7,170.29
1957
3,600.15 In determining the deficiencies in question the respondent determined that the petitioners received net income of $3,867.84 from the lease in 1955 and that the petitioners did not realize any income or sustain any deductions with respect to the lease for 1956 and 1957. The net income from the petitioners' interest in the lease for the taxable years in question, being gross income less deductions for expenses, depreciation, and depletion, was as follows for the indicated years: 1955
$8,254.88
1956
7,170.29
1957
4,029.92
In an amendment to their petition the petitioners take the position that the respondent erred (1) in reducing by $5,094.06 instead of reducing by $707.02 the amount of income reported by them for 1955 from the Luse lease, (2) in reducing by $7,170.29 the amount of income reported by them for 1956 from the lease, and (3) in reducing by $3,600.15, instead of increasing *245 by $429.77, the amount of income reported by them for 1957 from the lease. In support of their position the petitioners contend that there should be included in their income subject to depletion for the years 1955, 1956, and 1957, as income constructively received in the respective years, all the proceeds from the sale of oil from their interest in the lease made during the respective years and that this will result (1) in a correct net income from the lease of $8,254.88 for 1955 instead of $8,961.90 as reported by them, (2) in a correct net income from the lease of $7,170.29 for 1956 as reported by them, and (3) in a correct net income of $4,029.92 for 1957 instead of $3,600.15 as reported by them. The foregoing stated amounts of "correct net income from the lease" for the respective years represent the gross income from the petitioners' interest in the lease less deductions for expenses, depreciation, and depletion. By taking the above position and making the foregoing contentions the petitioners are seeking to include in their taxable net income for 1955, 1956, and 1957, as income constructively received by them during those years from their interest in the lease, the amounts of *246 $4,387.04, $7,170.29, and $4,029.92, respectively, as representing amounts which Citizens National and First National received during the respective years and applied as payment on the indebtedness owing to such banks by Moseley. The petitioners have never received the above amounts and they have never received any payment from Moseley or from any other source with respect to such amounts. Moseley became completely and hopelessly insolvent in 1955. He has continued so and the record affords no basis for an expectation that petitioners will ever recover anything from him on account of the above amounts. In view of the foregoing we think it is apparent that the petitioners may never receive anything with respect to the amounts in question. In Andrew E. Rossi, 41 B.T.A. 734, which involves a situation somewhat similar to that presented here, it was held that the rule or principle of constructive receipt does not require a taxpayer who reports income on the cash receipts basis to report as income an amount of income which he may never receive. As there pointed out the time for the taxpayer to report such income will be the year in which he actually receives it. In view of *247 the holding in the Rossi case and in view of the situation presented here and since the petitioners reported their income for the taxable years in question on the cash basis, we hold that the petitioners did not during 1955, 1956, and 1957 constructively receive the amounts of $4,387.04, $7,170.29, and $4,029.92, respectively, here in controversy and that under their method of accounting, such amounts were not properly includible in their income. The respondent's action as to this issue is sustained. In their income tax returns for 1955, 1956, and 1957 the petitioners took deductions for bad debts of $9,883.41, $11,356.28, and $7,261.68, respectively, as representing indebtedness owed to them by Moseley which became worthless in the respective years. The respondent disallowed the deductions in determining the deficiencies. In an amendment to their petition the petitioners take the position that the respondent erred (1) in disallowing the deduction of $9,883.41 for bad debts taken for 1955 instead of disallowing only $494.16 thereof, (2) in disallowing the deduction of $11,356.28 for bad debts taken for 1956, and (3) in disallowing the deduction of $7,261.68 for bad debts taken *248 for 1957 instead of allowing an additional deduction of $536.61 for that year. In support of their position the petitioners contend that, as a result of his activities in connection with the operation of the Luse lease and by reason of his having collected and retained part of the income from their interest in the lease and by reason of the application of part of the income from their interest in the lease to the payment of his bank indebtedness, Moseley became indebted to them (1) in the amount of $9,389.25 by December 31, 1955, (2) in the additional amount of $11,356.28 in 1956, and (3) in the additional amount of $7,798.29 in 1957, and that such amounts of indebtedness became worthless during the respective taxable years. The stipulation of facts filed by the parties contains the following respecting the above-mentioned deductions for bad debts taken by petitioners for the years in question: The business bad debt deduction in the amount of $9,883.41 claimed by petitioners for the taxable year 1955 represents the difference between the income earned by a two-fifths (2/5) interest in the Luse Lease during 1955 and the cash paid to petitioners by Moseley during 1955, plus other *249 amounts of income earned by the Luse Lease in prior years which were not actually paid in cash to petitioners. * * * The business bad debt deduction in the amount of $11,356.28 claimed by petitioners for the taxable year 1956 represents the difference between the income earned by a two-fifths (2/5) interest in the Luse Lease and the actual cash paid to petitioners during 1956 by Moseley. * * * The business bad debt deduction in the amount of $7,261.68 claimed by petitioners for the taxable year 1957 represents the difference between the income earned by a two-fifths (2/5) interest in the Luse Lease and the actual cash paid to petitioners during 1957 by Moseley. The above statement as to the deduction of $9,883.41 taken for bad debts for 1955 is to the effect that the $9,883.41 consisted (1) of the difference between the income earned by a two-fifths interest, the amount of the petitioners' interest in the Luse lease during 1955, and the cash paid to petitioners by Moseley during 1955, plus (2) other undisclosed amounts of income earned by the lease in years prior to 1955 which were not actually paid in cash to petitioners. The stipulation of facts show that during the period *250 January 1, through June 7, 1955, Moseley paid the petitioners a total of $6,143.81 attributable to their two-fifths interest in the lease. Other evidence contained in the record shows that since June 7, 1955, Moseley has not made any further payments to the petitioners, and the petitioners have received no payments from any other source on account of their share of the net income from the lease having been applied in payment of Moseley's bank indebtedness. Respecting the payment of $6,143.81 made by Moseley to petitioners in 1955, the petitioners in their original brief have requested us to find that it covered "the balance due for their share of the net income of the Luse lease for 1954 and part of the net income for 1955" and have further asked us to find that "$3,867.84 of the income for 1955 represents income from the Luse lease received by Petitioners from Moseley in cash." The respondent having stated in his reply brief that he had no objection to such findings, we have found that $3,867.84 of the $6,143.81 represented cash payment to petitioners by Moseley as part of the amount due them for their share of the net income from the lease for 1955 and $2,275.97 represented cash *251 payment to petitioners by Moseley as the balance due them for their share of the net income from the lease for 1954. On the basis of the foregoing there was no amount owing to the petitioners, at least after June 7, 1955, with respect to their share of the income from the lease for 1954, as to which a deduction for bad debts could properly be taken or allowed for 1955. Respecting "other amounts of income earned by the Luse Lease in" years prior to 1954 "which were not actually paid in cash to petitioners," the stipulation of facts shows that prior to September 28, 1954, the petitioners were authorized to and did, in fact, draw checks on Moseley's bank account with the First National Bank of Athens, Texas (not the First National Bank of Dallas, Texas, referred to herein as First National), for the amounts set forth in the monthly statements furnished to the petitioners by Moseley showing the income earned by petitioners' two-fifths interest in the Luse lease. In the foregoing state of the record and in the absence of any showing or contention that the monthly statements furnished by Moseley to petitioners prior to September 28, 1954, did not correctly reflect the petitioners' share *252 of income from the lease or that any checks drawn by petitioners on Moseley's bank account for their share of the income were not paid by the bank, we are unable to conclude that at any time during 1955 there was any amount owing to the petitioners with respect to the income from their interest in the lease for any year prior to 1954. Since we are unable to find that after June 7, 1955, there was any amount owing to the petitioners with respect to their share of the income from the lease for 1954 or any year prior thereto, we are unable to conclude that any amount was allowable to petitioners as a bad debt deduction for 1955 with respect to income from the lease for any prior year. In their reply brief the petitioners state that this issue - the correctness of the respondent's disallowance of the deductions taken by the petitioners for bad debts for 1955, 1956, and 1957 - involves the question of whether, if petitioners' income from the lease was constructively received by them during the years in question, they are then entitled to deduct as a business bad debt, the amount of such constructively received income which was applied each year in payment of Moseley's loans. Although *253 contending that the income applied each year in payment of Moseley's loans was constructively received by them, they state that they agree that no deduction is allowable if the income for 1955, 1956, and 1957 was not constructively received. In view of the foregoing and since we have held above that the amounts, which the petitioners sought to include in their income as income having been constructively received, had not been constructively received by them and were not properly includible in their income, we sustain the respondent's action as to this issue. Decision will be entered for the respondent. Footnotes
1. Allowable depreciation was increased by this amount.↩